## SMITH *v.* CURRAN.

1. SIGNATURES—MUNICIPAL CORPORATIONS—REFUNDING BONDS—FAC-
   SIMILES.
   > Facsimile signatures by mayor, city clerk and city treasurer and resolution of common council authorizing the use of such signatures on refunding bonds may be record evidence for future estoppel but are insufficient to legalize them in advance of issuance or to require execution by controller.

2. SAME—COUNTERSIGN—ATTEST.
   > Countersign and attest as terms are used in city charter betoken solemn personal acts of authentication of genuineness (Detroit Charter, title 6, chap. 5, § 3).

3. MUNICIPAL CORPORATIONS—CHARTERS—SIGNATURES ON REFUNDING
   BONDS.
   > Considerations of inconvenience to city officials do not justify court's approval of violation of charter provisions as to signatures on city refunding bonds in advance of their issuance.

4. CONSTITUTIONAL LAW—MANDAMUS—QUESTIONS REVIEWABLE.
   > Constitutionality of act under which refunding of city indebtedness is alleged to have been carried on is not decided on mandamus proceeding where writ is denied on other grounds.

Mandamus by John W. Smith and others, comprising the Common Council of the City of Detroit, to compel William J. Curran, controller, to execute certain refunding bonds. Submitted May 29, 1934. (Calendar No. 37,902.)   Writ denied June 4, 1934.

*Raymond J. Kelly* and *Paul T. Dwyer,* for plaintiffs.

*Clarence J. Huddleston,* for defendant.

FEAD, J.   This is mandamus to compel the controller of the city of Detroit to execute certain refunding bonds, in the amount of about $360,000,000. He claims (a) want of proper execution by other officers and (b) want of legal authority to issue the bonds.

Section 3, chapter 5, title 6 of the charter of the city of Detroit reads:

"All bonds issued by the municipality shall be issued in the name of the city of Detroit, a municipal corporation organized and existing under the laws of the State of Michigan, and shall be exempt from all city taxation.   Such bonds shall be issued under the seal of the city, regularly dated and numbered and signed by the mayor, countersigned by the controller, and attested by the city clerk."

Section 12 provides that when the council shall have authorized the sale of bonds, the controller shall prepare them, and shall cause to be written or printed on the outside fold of each bond, the following words "to be signed by the city treasurer:"

"This bond has been made and issued in compliance with law; has been duly registered in the books of this office; and the proceeds of the same, together with all the premiums on sale and interest

accruing before delivery, have been paid into this office.''

After causing the bonds to be duly executed and recorded in his office, the controller shall transmit them to the city treasurer, take his receipt and report to the common council.

Section 13 provides that the city treasurer shall record the bonds, deliver them and report to the common council. ''He shall sign the blank prepared by the controller, and no bonds shall be valid without his signature.''

May 8, 1934, the common council adopted a resolution for the issuance of refunding bonds, under authority of Act No. 143, Pub. Acts 1933, as supplemented by Act No. 31, Pub. Acts 1934 (Ex. Sess.). The resolution provides:

''Article 11, § 10. All bonds issued under the provisions of this resolution may be signed by the facsimile signatures of the mayor, city clerk and city treasurer in lieu of the manual execution of same by said officers, and facsimiles of said signatures printed, lithographed or engraved on said bonds, shall be due execution of said bonds for all purposes, and such bonds when so executed shall be valid and binding obligations of the city of Detroit. The city controller is hereby directed to sign said bonds by manual signature.''

The next day the mayor, city clerk and city treasurer addressed a communication to the common council notifying it that they would ''execute all refunding bonds issued under said resolution with a printed, lithographed, or engraved facsimile signature, which facsimile signatures are hereby adopted by the undersigned as their official signatures for the due execution of said bonds.''

On the same day, the controller notified the common council that he would not sign the bonds by manual signature because there is no authority in law for the execution by the other officers except by manual signature and because he was informed that Act No. 31, 1934 (Ex. Sess.), upon which the city relies for authority to issue the bonds, is unconstitutional.

In actions to enforce public bonds or obligations for which the public body has received consideration, substitute signatures by lithographed facsimile, or name written by another, or printed, have been held valid. *Pennington* v. *Baehr,* 48 Cal. 565; *Town of Lexington* v. *Union National Bank,* 75 Miss. 1 (22 South. 291); *Town of Weyauwega* v. *Ayling,* 99 U. S. 112; *Hewel* v. *Hogin,* 3 Cal. App. 248 (84 Pac. 1002); *Montgomery* v. *Township of St. Mary's,* 43 Fed. 362; *Toon* v. *Wapinitia Irrigation Co.,* 117 Ore. 374 (243 Pac. 554); *Just* v. *Township of Wise,* 42 Mich. 573. In those cases elements of estoppel abided because the public had received consideration; in some, estoppel was emphasized and in some the practice of substitute signature was condemned.

Enforcement of issued obligations is not before us. The precise situation at present is that the mayor, city clerk and city treasurer propose to delegate to a print shop the duty of signing their names to the bonds. Until the bonds are actually printed and approved by the officers, the adoption of signatures could not be completed. The resolution of the common council authorizing facsimile signatures has no effect to legalize the signatures. At most, it provides record evidence for future estoppel. We could hardly declare the signatures sufficient at this time. However, it is the ultimate proposition in which the parties are interested and we pass to it.

We need spend no time on general definitions of the charter words "signed," "countersigned" and "attested." Naturally they take some of their force from context and purpose, although "countersign" and "attest" inherently betoken solemn personal acts of authentication of genuineness. 6 C. J. p. 551; 15 C. J. p. 378. The precise, specific and cautious provisions of the charter surrounding the issuance of bonds, obviously designed to provide checks against issuance of spurious securities and to afford evidence of genuineness for ready marketing, put it beyond doubt that the people intended official action of the four officers to be proved by their own handwriting. If any of them may adopt a facsimile signature, all of them may and the safeguards imposed by the charter would be impaired.

The reason given for substitute signatures is to save time of officers and expense to the city. As a matter of moving the discretion of the court, the reason would not overbalance the disadvantage to a bondholder, on enforcement of the obligation, of being required to present affirmative proof of the adoption of the signatures by the officers and discover evidence of estoppel. In any event, no considerations of inconvenience would justify the court in approving, in advance of the issuance of the bonds, violation of the plain mandate of the charter.

The writ of mandamus will be denied, without costs.

The point is also presented whether Act No. 31, 1934 (Ex. Sess.), was adopted in violation of the Constitution, article 5, § 22:

"No bill shall be passed at a special session of the legislature on any subjects than those expressly stated in the governor's proclamation or submitted by special message."

·It is said the city relies on Act No. 31 in its refunding operation. Counsel have ably and exhaustively briefed the general proposition of laws adopted at special sessions of the legislature. But the record does not set up the classes or character of the bonds to be refunded. Counsel do not attempt an analysis of the act nor indicate in what manner it is involved in the refunding project. Aside from the fact that the present controversy is disposed of on the question of signatures and the rule that constitutionality of an act will not be passed upon where a case may be otherwise decided, the effect of a ruling on validity has such far-reaching possibilities that we think it should not be made except upon full presentation of facts and law.

Writ denied, without costs.

Nelson Sharpe, C. J., and Potter, North, Wiest, Butzel, Bushnell, and Edward M. Sharpe, JJ., concurred.